James H. CLARK and Barbara Brown, Plaintiffs,

v.

CALHOUN COUNTY, MISSISSIPPI, et al., Defendants.

No. WC91–65–S–D.

United States District Court, N.D. Mississippi, W.D.

Feb. 4, 1993.

Ellis Turnage, Morris, Turnage & Associates, Cleveland, MS, for plaintiffs.

Henry L. Lackey, Lawrence Chandler, Calhoun City, MS, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SENTER, Chief Judge.

This voting rights case came on for hearing before the court on November 16, 1992. Having heard the evidence and considered the argument of counsel and the applicable case law, the court is now prepared to render its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

### INTRODUCTION

In this action alleging violations of the Voting Rights Act, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments, plaintiffs challenge the existing supervisory reapportionment plan for Calhoun County, Mississippi. This plan is used to elect county supervisors, county election commissioners, and board of education members. Plaintiffs argue that the present plan contains no majority black voting age population district even though blacks in the County are numerically large and geographically compact to constitute such a district. Plaintiffs concede that "[b]ecause this case can sufficiently be decided under the Section 2 standard, it is not necessary to reach the constitutional issues of vote dilution." Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 12.

### FINDINGS OF FACT

1. The named plaintiffs, James H. Clark and Barbara Brown, are black adult resident citizens and electors of Calhoun County, Mississippi. Ms. Brown registered to vote in Calhoun County in April, 1991, and interestingly, filed this action approximately two months later. Class certification was not sought in this case.

2. The named defendants are Calhoun County, Mississippi; the Calhoun County, Mississippi Democratic Executive Committee; the Calhoun County, Mississippi Republican Executive Committee; and the Calhoun County, Mississippi Election Commission.

3. According to the 1990 Census, Calhoun County, Mississippi, has a total population of 14,908—of which 4,027 (27.01%) are black and 10,881 (72.99%) are white and of other ethnic origins. Compared to the 1980 figures, the County experienced an overall decrease in population of 736 people. Interestingly, these figures represent a 1.52% increase in the black population from 1980 and a 1.52% decrease in the white population. The 1990 figures are further broken down to show that the vot-

ing age population is 10,986—of which 2,578 (23.47%) are black and 8,408 (76.52%) are white and of other ethnic origins.

4. After these figures were made available to the County (in February, 1991), it engaged the assistance of Three Rivers Development and Planning District of Pontotoc, Mississippi, to develop a redistricting plan. Towards that end, the Board of Supervisors requested that Three Rivers consider the following criteria:

A. If at all possible, the population deviation should be held to 5% or less;

B. The voting strength of all minorities within the County should be considered so as not to dilute their present strength and/or to "pack" any one district in order to dilute the overall minority voting strength;

C. If possible, no incumbent supervisor should be placed in a district with another incumbent supervisor;

D. The present voting precincts should be maintained if at all possible; and

E. The separate bonded indebtedness of Districts 1 and 4 should be considered in order to minimize taxing districts and confusion.

5. At the same time, the Board appointed a 10–member biracial committee (composed of one black and one white from each of the five supervisory districts) to meet with Three Rivers and "to act as a supervisory committee to the said Three Rivers ... and to assist in dissemination of information to the public." Defendants' Exhibit 3.

6. The first meeting of the biracial committee was held on March 5, 1991. At that time, Richard McCraw of Three Rivers explained to the committee its functions and advised it of the Board's criteria for devising a new redistricting plan. After a "full discussion" of these criteria, the committee itself adopted them. Defendants' Exhibit 4.

7. The following day, the Board met with Three Rivers and discussed possible changes to Three Rivers' two proposed plans; however, it took no action on either proposal. *Id.* On March 8, 1991, the Board met once again and tentatively adopted one of the Three Rivers' plans. *Id.*

8. The biracial committee met a second time on March 11, 1991. At that time, Three Rivers showed the committee all of the changes recommended by it and tentatively adopted by the Board. After finding the proposal to be in line with the established criteria, the committee approved one of the plans presented to it. The vote was 8–0, with all five of the black members voting in favor of the Three Rivers' plan (one of the white members had previously resigned, and one did not vote). *Id.*

9. At some point before the committee voted, the Board had recognized the necessity of a public hearing on any redistricting proposal made by Three Rivers. Advance notice of the hearing was published in two Calhoun County newspapers, the *Calhoun County Journal* (published in Bruce, Mississippi) and the *Monitor Herald* (published in Calhoun City, Mississippi), on March 7, 1991 (one week before the hearing). Each of these papers also carried articles on the proposed redistricting plans and the upcoming public hearings.

10. On March 14, 1991, a public hearing was conducted and was televised over the local cable channel. (All of the previous Board meetings had also been televised.) At the hearing, Mr. McCraw explained the necessity for redistricting and the three major changes proposed in the plan. Only two objections were raised (one of them being from an announced candidate for supervisor), and both were addressed. Having received no further suggestions or indications of dissatisfaction, the Board formally adopted the plan as approved by the biracial committee. Defendants' Exhibit 5.

11. The County then submitted the proposed plan to the United States Department of Justice for preclearance pursuant to Section 5 of the Voting Rights Act. By letter dated May 17, 1991, the Justice Department requested additional information from the County. The County complied with this request, and on July 29, 1991, the Justice Department advised the County that the Attorney General interposed no

objections to the specified changes in its redistricting plan. Defendants' Exhibit 12.

12. Under this plan, the supervisory districts are divided as follows:

| District | Total Pop. | Black Pop. | Black Pop. % | Other Pop. | Other Pop. % |
|---|---|---|---|---|---|
| 1 | 3014 | 700 | 23 % | 2314 | 77 % |
| 2 | 3008 | 884 | 30 % | 2124 | 70 % |
| 3 | 2954 | 551 | 19 % | 2403 | 81 % |
| 4 | 3002 | 1265 | 42 % | 1737 | 58 % |
| 5 | 2930 | 627 | 21.4 % | 2303 | 78.6 % |
| Total | 14908 | 4027 | 27.01% | 10881 | 72.99% |

13. In this century, no black candidate has been elected in Calhoun County as supervisor, justice court judge, constable, sheriff, circuit clerk, chancery clerk, tax assessor, superintendent of education, school board member, coroner, county attorney, state senator, or state representative. Although the evidence revealed that since 1980 blacks have sought the positions of justice court judge, constable, sheriff, and school board member, no evidence was presented to show that during this time period (or any other) blacks ran for any of the other county offices.

14. Bruce, which is the largest incorporated municipality in Calhoun County and, according to the 1990 census, has a 37.42% black population, has a four ward one at-large electoral scheme for electing members of its Board of Aldermen. On two occasions, blacks have been elected as at-large aldermen, and a black, elected from a majority black voting age ward, presently serves on the Bruce Board. Vardaman, which is the fourth largest incorporated municipality in the County, has a 33.59% black population and elects its Board of Aldermen members completely at-large. One black has served or presently serves as an alderman in Vardaman.

15. Of the 75 County employees, only 6, or 8%, are black. Plaintiffs' Exhibit 37. Of the 14 County Boards and Commissions, blacks are represented on 4 of them. Plaintiffs' Exhibit 38.

16. The voter registration records of Calhoun County, Mississippi, are not maintained by race, nor is there a candidate slating process in the County.

17. Section 23–15–305 of the Mississippi Code requires a majority vote to win party nominations and special elections for all county-and district-wide elected offices in Calhoun County.

18. Cheri McKinless, plaintiffs' expert in racial bloc voting analysis, applied two statistical methods to determine voting preferences of white and black voters in Calhoun County—ecological regression and extreme case analysis. Ms. McKinless studied only the black versus white elections and concluded that extreme racial polarization exists in Calhoun County. In other words, in a black versus white election, black citizens overwhelmingly tend to vote for the black candidate, and white citizens almost always vote for the white candidate. Ms. McKinless found little white cross-over voting and stated that there is not enough black voting age population in any of the existing supervisory districts to overcome the white bloc voting. Furthermore, even if every black voting age person turned out, "if the black candidate is getting no support from the white population, there is no way a black candidate can be elected under the current system." Under these circumstances, it was her opinion that "there is no way a black candidate would be elected. So they're unable to elect a candidate of their choice." To remedy this situation, Ms. McKinless opined that Calhoun County needs a strong majority black voting age population district.

19. Ms. McKinless also analyzed the socioeconomics of Calhoun County. This

analysis was performed because, according to her, people of lower socioeconomic status turn out for elections at a much lower rate than people with a higher socioeconomic status. In Calhoun County, she specifically found the following:

a. The black mean household income is 65% of the white mean household income;

b. Black per capita income is less than 50% that of white per capita income;

c. Three times more blacks live in poverty than whites;

d. More than twice the number of blacks are unemployed than whites.

She concluded that these socioeconomic factors are "another obstacle" that the black population of Calhoun County must overcome and combine with the racial bloc voting to prevent blacks from being elected.

20. Barbara Brown, one of the plaintiffs, variously stated her reasons for filing this action as: (1) "[W]e are so spread in those districts we don't have enough ... for a black to be elected"; (2) "I just want a fair chance of getting the person in that I want in"; (3) "[W]e cannot vote any blacks in"; and (4) "I just want a black district."

Ms. Brown, who had not resided in Calhoun County for some time, also testified that "[b]efore they paved the roads, they used the graders and they would push.... [A]nd the sand just rushes in and the water [stands in the middle of the yard]." When questioned directly by her counsel whether, after the road was paved by the County, the water still accumulated, she answered: "Well, the sand still washes. You don't have sufficient [culverts]." In Ms. Brown's opinion, the recent repaving of the subject road was "done shabbily.... [I]t's not patched properly. It's just something throwed in there." However, when asked if she had ever personally complained to the Board about any of these matters, she answered negatively.

21. Victoria Caridas, who drew plaintiffs' proposed redistricting plan, testified that defendants could easily have "created a very viable majority black district considering the population, the way the black population is divided up amongst the districts...." Under the plan drawn by Ms. Caridas, the County would be divided as follows:

| District | Total Pop. | Black Pop. | Black Pop. % | Other Pop. | Other Pop. % |
|---|---|---|---|---|---|
| 1 | 2990 | 2239 | 74.88% | 741 | 24.78% |
| 2 | 2945 | 293 | 9.95% | 2635 | 89.47% |
| 3 | 2986 | 154 | 5.16% | 2819 | 94.41% |
| 4 | 2994 | 555 | 18.54% | 2436 | 81.36% |
| 5 | 2993 | 786 | 26.26% | 2198 | 73.44% |

Plaintiffs' Exhibit 18. District 1, plaintiffs' proposed majority black district, would therefore contain 55.6% of the total black population of Calhoun County and would have a black voting age population of 71.-3%. In Ms. Caridas's opinion, proposed District 1 is geographically compact and is not "packed." She testified that in drawing the proposal, she attempted to follow the existing boundaries and make minimum changes. Although she did not calculate the number of road miles in each district that each supervisor is required to maintain, Ms. Caridas did consider the distribution of road mileage: "I took into consider-

ation the road mileage in the sense that I examined the way the districts were already configured, and tried to create districts that ... deviated as little as possible from what was there...." She further testified that the existing plan is racially gerrymandered and "fragments" the black population of Calhoun County by dividing it among five districts; however, she also acknowledged that the present plan complies with the Constitution's one man-one vote requirement and that there was no retrogression of existing minority voting strength. Ms. Caridas stated that she considered neither the incumbency of the su-

pervisors nor the differences in political and social mores of blacks in each district.

22. Benny Thompson, District 3 supervisor, testified that, under the existing plan, the road mileage among the districts in Calhoun County is roughly equal; therefore, because the County operates under a beat system of government, the money to maintain County roads and facilities is equally divided five ways. According the Mr. Thompson, in this way, "we feel that all of the citizens of Calhoun County [are] getting an equal share of the tax money...." Mr. Thompson acknowledged that the money could probably be distributed proportionately, rather than equally; however, because proposed District 1 contains minimal county road mileage, it would get such a low percentage of the money that the District 1 supervisor "could not serve his people in that beat under those circumstances." He elaborated: "[W]hen you pull all the money away from this black district, you're not able to serve your people. And if you can't ... be a servant to your people, what do you want with this job?" Mr. Thompson testified at length about things he had done personally for his black constituency and then expressed the present political reality of his position as follows:

[T]he way it is right now, these blacks ... can either elect me, or they can beat me.

You put all the blacks in one beat, and ... I would have 5 percent black left. Five percent ... couldn't elect me or couldn't beat me.

[R]ight now ... they have got ... political pull in every beat. They have got strength in every beat.

23. Vernon Kelly, executive director of Three Rivers Development and Planning District, confirmed this latter view:

I don't think there is any question in Calhoun County under the preapproved plan that the minorities have a voice. In fact, a candidate in a competitive race cannot be elected without the support of minority candidates in his district or a major majority of them. Therefore, I think it makes each of the supervisors, particularly the three that have major impact areas, very responsive to the minority voting strength.

24. Mr. Kelly also explained that between 1980 and 1990, Calhoun County experienced an 840 person decrease in population. Therefore, in devising the Three Rivers plan, he and his associates "moved between two or three districts the smallest number possible while bearing in mind that we could not dilute any minority voting strength. In fact, in the strongest impact district we increased minority voting strength." He further testified that the districts are, as closely as possible, equal in size, and thus the County contains no unusually large districts. Mr. Kelly stated that he had never seen any County official be unresponsive to the needs of the black community. He illustrated by referring to an access road project which was requested by black constituents and sponsored by the Board of Supervisors. With regard to the existing supervisory plan, Mr. Kelly opined that the plan was cohesive and compact and was not gerrymandered. In his opinion, the plan represents all of the people in Calhoun County, considers community feelings, and does not "totally tear up" the County. In contrast, plaintiffs' proposed plan which pulls the blacks out of Bruce, Calhoun City, and Derma is not cohesive and compact, is a "perfect example" of packing, and does not "represent[ ] the needs of the county as far as the future relationship between black citizens and white citizens in Calhoun County." The result of this, according to Mr. Kelly, is

[y]ou got a district now in Calhoun County where you have major minority impact from three minimum, probably four supervisors that they must listen to. When you go to this system where you pack all the blacks that would have any impact, significant impact into one area, you got a four to one vote on everything.

Mr. Kelly did not deny that a majority black district could be created in the County but explained: "There are things that can be done and there are things that are reasonable in the total realm and intent of the law."

25. Debra Dunn, who has served as the Circuit Clerk of Calhoun County since 1984, testified that she encouraged Sheila Steen, a black female and former deputy circuit clerk, to run for Election Commissioner of District 3, which is 81% white. Ms. Steen was elected, without opposition, to that office in the November, 1992, general election. Ms. Dunn also explained the mechanics of Mississippi's "liberal" absentee voter statute and noted that transportation to the polls on election days is available through both political committees.

26. Geneva Rose, a black female and former teacher who now works with Head Start, was a member of the biracial committee. She testified that the committee members were given handouts explaining population statistics for Calhoun County and were asked to speak with people in their communities and districts about the proposed plans. Ms. Rose also stated that the committee was told the plan had to be approved by the Justice Department. She acknowledged that she contacted various citizens in her community about Three Rivers' proposals and received no negative input from any of them.

## CONCLUSIONS OF LAW

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

■ The United States Supreme Court has established three "necessary preconditions" which plaintiffs must prove to advance their Section 2 claim: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; and (3) that a bloc-voting white majority usually defeats the minority's preferred candidate. *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–2767, 92 L.Ed.2d 25 (1986). Plaintiff's failure to establish any one of these three elements is fatal to their claim. *Brewer v. Ham,* 876 F.2d 448, 451 (5th Cir.1989).

■ However, "[s]atisfying the threshold test ... does not prove a plaintiff's Section 2 claim; the district court must then proceed to the totality of the circumstances inquiry," *Monroe v. City of Woodville,* 881 F.2d 1327, 1330 (5th Cir.1989), to determine whether the challenged electoral plan impedes the ability of minority voters to elect representatives of their choice. 42 U.S.C. § 1973(b); *Thornburg,* 478 U.S. at 79, 106 S.Ct. at 2781. In making this evaluation, the court looks to the factors enumerated in the Senate Judiciary Committee majority report accompanying the 1982 amendments to Section 2. *East Jefferson Coalition v. Parish of Jefferson,* 926 F.2d 487, 491 (5th Cir.1991); *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1206 (5th Cir.1989) (*Westwego I*). These include:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to regis-

ter, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that political process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Westwego*, 872 F.2d at 1205. Additional factors which may be probative are

(1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and

(2) whether the policy underlying the state or political subdivisions's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

*Id.*

 This list is "neither comprehensive nor exclusive," *Thornburg*, 478 U.S. at 45, 106 S.Ct. at 2763, and "other factors may also be relevant and may be considered." *Id.* Furthermore, "'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other,'" *id.* (citation omitted), for the test is intended to be a flexible, "fact-bound, intensely local appraisal of the challenged electoral sys-

tem." *Monroe*, 881 F.2d at 1329. There are certain limitations, however. For example, "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Thornburg*, 478 U.S. at 46, 106 S.Ct. at 2764. Nor does this test "assume the existence of racial bloc voting; plaintiffs must prove it." *Id.* In the final analysis, the ultimate question remains whether "'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Id.* 478 U.S. at 44, 106 S.Ct. at 2763 (citation omitted). This does not, however, "create two separate and distinct rights." *Chisom v. Roemer*, 501 U.S. ——, ——, 111 S.Ct. 2354, 2365, 115 L.Ed.2d 348, 364 (1991). Rather, "the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom*, 501 U.S. at ——, 111 S.Ct. at 2365, 115 L.Ed.2d at 364. *See Turner v. Arkansas*, 784 F.Supp. 553, 573 (E.D.Ark.1991) ("'Less opportunity' ... means 'less opportunity' than such black voters had immediately before the imposition or application of the challenged standard practice or procedure; not 'less opportunity' than they would have, had the legislature seized the opportunity to help them by maximizing their political influence"), *aff'd*, —— U.S. ——, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992).

## I. The Three Necessary Preconditions

### A.

 As noted previously, the first precondition which plaintiffs must prove is that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. Although plaintiffs have proved that the black population of Calhoun County is sufficiently large enough to constitute a majority in one district, they have failed to prove that this same minority group is geo-

graphically compact. Under plaintiffs' proposed plan, blacks from three separate and distinct municipalities, each having diverse interests, were extracted to form District 1. This exercise results in extreme gerrymandering, plaintiffs' proposed black district having been "drawn in an unusual or illogical manner to enhance the voting power of a particular ... voting bloc at the expense of other individuals or groups who would be elected or help elect the candidates of their choice." *Magnolia Bar Association, Inc. v. Lee*, 793 F.Supp. 1386, 1396 n. 11 (S.D.Miss.1992). If one assumes that all voting in Calhoun County will be based on race and not qualifications, then the district suggested by plaintiffs may well accomplish the automatic election of a black supervisor. However, this success would be achieved at the expense of the other blacks in the County, 44% of whom would be dispersed among four other districts. *See Turner*, 784 F.Supp. at 563 ("The adversarial system does not work too well in this type of litigation because of the absence of adequate notice to affected parties and also because of the mixed motives and interests of the actual parties and the sponsors of such litigation"). As recognized by the Supreme Court, racial minority group voting strength may be diluted not only by dispersing blacks into districts "in which they constitute an ineffective minority of voters," *Thornburg*, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11, but also by concentrating blacks in districts "where they constitute an excessive majority." *Id.* In this court's opinion, under plaintiffs' proposal, the voting strength of blacks not included in District 1 would be diluted to such an extent that they would have less opportunity to participate in the political process and to elect members of their choice.

### B.

■ "Evidence of racially polarized voting 'is the linchpin of a section 2 vote dilution claim,' and is relevant to establishing two of the three elements set forth in the *Gingles* decision—the political cohesiveness of the minority group and the ability of the white majority usually to defeat the minority's preferred candidate." *Westwe-*

*go I*, 872 F.2d at 1207 (citation omitted). These prerequisites are "complementary aspects of racial bloc voting in which race and voting behavior are interrelated. Racial bloc voting exists if 'black voters and white voters vote differently.' *Thornburg v. Gingles*, 478 U.S. at 53 n. 21, 106 S.Ct. at 2768 n. 21, 92 L.Ed.2d at 48 n. 21." *Ewing v. Monroe County, Mississippi*, 740 F.Supp. 417, 419–20 (N.D.Miss.1990).

In this case, plaintiffs proved that during the last twelve years, containing elections held in 1980, 1983, 1986 and 1987, twelve black candidates sought elective office in Calhoun County but were defeated. However, the evidence also revealed that black persons have been elected, at-large, to public office in two separate majority white municipalities, and recently, Ms. Steen, a black female, was elected to the office of election commissioner without opposition in District 3, which has a black population of only 19%.

By limiting the analysis of racial bloc voting to the twelve black candidates suggested by plaintiffs, there can be no conclusion except that racial bloc voting did exist in Calhoun County. Although the steady increase in black officeholders in the County cannot remove the statistically-based conclusion presented by plaintiffs, it clearly evidences, together with other evidence presented by defendants, that racial polarization and racial bloc voting are steadily but surely coming to an end in Calhoun County. *Compare Gunn v. Chickasaw County, Mississippi*, 705 F.Supp. 315, 319 (N.D.Miss.1989) (after noting success of black candidates in majority white town of Woodland, Mississippi, which utilized at-large voting scheme, court stated, "The success of these black citizens in the Town of Woodland is laudable, and is probative of white cross-over voting") *with Ewing*, 740 F.Supp. at 425 ("The municipal electoral success of black aldermen in Aberdeen and Amory from *black majority wards* does not negate the plaintiffs' proof of white bloc voting") (emphasis added).

### II. The Totality of the Circumstances

■ Although the court finds that plaintiffs have failed to prove that a majority

black supervisory district can be formed in Calhoun County in a geographically compact configuration, the court will nevertheless proceed to analyze the totality of the circumstances to determine whether plaintiff has proved that the challenged electoral system impedes the ability of minority voters to elect representatives of their choice.

## A.

█ As to the first factor, the history of official discrimination, "Congress was concerned not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system." *Westwego I*, 872 F.2d at 1211–12. Recently, courts in both the Northern District and Southern District of Mississippi have addressed this factor. In *Magnolia Bar Association*, Judge Barbour took "judicial notice of the past history of official discrimination in the State of Mississippi." *Magnolia Bar Association*, 793 F.Supp. at 1408. However, he tempered this finding with the caution that "the extent to which black citizens fail to exercise their obligations to vote diminishes the weight to be given the history of official discrimination." *Id.* Judge Davidson, in *Teague v. Attala County*, 807 F.Supp. 392 (N.D.Miss.1992), found that "[v]oter registration levels are comparatively the same for black and white Mississippians," *id.* at 404, and then chastised the plaintiffs for their "feeble explanations," *id.*, for the lower voter turnout among blacks as compared with whites. *Id.*

This court will not deny that in the past blacks were prevented from exercising their right to vote by intentionally discriminatory mechanisms, *see Houston v. Haley*, 663 F.Supp. 346, 350 (N.D.Miss.1987) (this court took judicial notice that racial discrimination has historically existed in Mississippi and in City of Oxford, Mississippi), *aff'd*, 859 F.2d 341 (5th Cir.1988), *vacated*, 869 F.2d 807 (5th Cir.1989), and that they "often do not sponsor a black candidate because of the 'very barriers to political participation that Congress sought to remove.'" *Westwego Citizens for Better*

*Government v. City of Westwego*, 906 F.2d 1042, 1044 (5th Cir.1990) (citation omitted) (*Westwego II*). But at some point, this factor must take on diminished importance. As plaintiffs themselves recognize, "Calhoun County, Mississippi discontinued the use of a poll tax, literacy tests, citizenship test and a good moral test as a pre-requisite to voting or voter registration contemporaneously with the passage of the Voting Rights Act [on November 1, 1964]." Plaintiffs' Proposed Findings at 4 and 5.

█ Nearly thirty years have passed, and in the interim, no one can seriously dispute that blacks have made important inroads into all aspects of American society, including the political arena. Past history cannot be forever faulted for failures at the election box. As recognized by the Fifth Circuit, "The purpose of section 2 is not to guarantee a minority group that it will elect candidates of its choice, or even that it will be represented in whatever governing body is at issue.... [T]he 'potential to elect' is all that is required under section 2." *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1117 n. 9 (5th Cir.1991) (*Westwego III*). But even the "potential to elect" cannot be achieved unless people vote, and it is an "erroneous assumption that a small group of voters can never influence the outcome of an election." *Chisom*, 501 U.S. at —— n. 24, 111 S.Ct. at 2365 n. 24, 115 L.Ed.2d at 364 n. 24. *See Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1556 (5th Cir.1992) ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote"); *Teague* at 405 ("Rather than unequal electoral opportunity, the source of minority candidate defeat can be traced to the failure to energize an apathetic electorate"). Although this court acknowledges the history of official discrimination, it finds this factor to be of limited importance.

## B.

Of the seven original Senate factors, "the Supreme Court has held that the two

most important factors to consider in inquiring into the totality of the circumstances in a section 2 claim are 1) whether the electorate is racially polarized, and 2) whether, under the challenged electoral practice, the minority group has been able to elect candidates of its choice." *Westwego III*, 946 F.2d at 1122. The court has already analyzed the racial polarization factor, *see supra* at 1198, and although it technically weighs in plaintiffs' favor, the court cannot disregard the success that black candidates have experienced in two predominately white municipalities or Ms. Steen's election to a County office from an overwhelmingly white district. In this court's view, these elections indicate a steady diminution of racially polarized voting and demonstrate that the electorate will vote for the most qualified candidate, regardless of race. *See Teague* at 405 ("Political victories are the fruit of organizing, energizing and mobilizing an electorate to turn out and vote for a particular candidate.... The recipe for greater political clout is 'running candidates and turning out to vote' ").

### C.

■■■ Plaintiffs agree that unusually large election districts and anti-single shot provisions are not factors in this case. *See* Plaintiffs' Proposed Findings at 19. Mississippi does have a majority vote requirement; however, the court concurs with Judge Barbour that "[a]lthough abolition of the majority vote requirement ... might increase the chances for electoral success for black candidates, a majority vote requirement is not inherently discriminatory." *Magnolia Bar Association*, 793 F.Supp. at 1409 (citation omitted). *See also Gunn*, 705 F.Supp. at 320 (majority vote requirement not *per se* violative of Section 2); *cf. Ewing*, 740 F.Supp. at 423–26 ("[W]ith little or no white cross-over votes this requirement makes it more difficult but not impossible for blacks to elect candidates of their choice under the current redistricting plans"; "[t]he statutory majority vote requirement further diminishes the chance for blacks to be elected in majority white voting age population districts").

There was no further allegation that any other practices or procedures are currently used to enhance the opportunity for discrimination against blacks in Calhoun County.

### D.

No evidence was presented of a candidate slating process; therefore, this factor is not applicable. *See* Plaintiffs' Proposed Findings at 8.

### E.

In *Magnolia Bar Association*, Judge Barbour recently found

that blacks in Mississippi continue to bear the effects of discrimination in critical areas of socioeconomic attainment and this continues in some ways to affect their opportunity to participate in the political process and to elect representatives of their choice. A person with less education is less likely to vote than one with more education. A person with less money is less likely to own an automobile and therefore less likely to make the effort to go to the polls to vote or to the courthouse to register. However, since the passage of the Voting Rights Act of 1965 ... the black population has obtained substantial education regarding voting and the political process. Unfortunately, the socioeconomic standing of blacks vis-a-vis whites has changed little and it is unlikely that standing will improve markedly in the foreseeable future. Accordingly, this Senate Majority Report factor, the socioeconomic effects of discrimination, will be a factor on which plaintiffs in voting rights cases will always win in the foreseeable future. The issue thus becomes one of weight to be afforded this factor.

*Magnolia Bar Association*, 793 F.Supp. at 1409. This contrasts very markedly from the findings of Judge Biggers in *Ewing*. *See Ewing*, 740 F.Supp. at 423 (court found "no evidence of any present impediment to black voter participation as a result of any lingering effects of discrimination"). In *Teague* (which, like *Ewing*, originated in

the Eastern Division of the Northern District of Mississippi) Judge Davidson carefully analyzed the socioeconomic trends and conditions of Attala County by comparing the data from the 1980 and 1990 censuses. *Teague* at 399–401. He found that blacks had made marked improvements in all areas, including employment, education, income, and noted a "sharp decline" in the number of blacks living below the poverty level. *Id.* Having made these findings, he continued:

> To say the improvements blacks have experienced over the last ten years are merely "adequate" severely underestimates the substantial ground traveled on the journey toward equality. The Census figures are a strong indication of the remarkable inroads blacks have made in areas where, historically, they had encountered discriminatory treatment. At the very least, the numbers are encouraging.

*Teague* at 404.

In this case, defendants did not refute the socioeconomic findings of plaintiffs' expert, Ms. McKinless. The court therefore accepts as true and accurate her conclusion that "the socio-economic status of blacks is significantly lower than whites in Calhoun County." Plaintiffs, Exhibit 2. The court questions, however, the weight to be assigned to this factor.

### F.

No evidence was presented on the factor of racial appeals in political campaigns in this case. *See* Plaintiffs' Proposed Findings at 10.

### G.

The two remaining Senate factors—responsiveness and tenuousness—are considered by the Fifth Circuit to be of "limited relevance," *Westwego III*, 946 F.2d at 1120 n. 16, 1122–23; nevertheless, they are routinely considered by courts in assessing a Section 2 claim. *See, e.g., Magnolia Bar Association*, 793 F.Supp. at 1412; *Ewing*, 740 F.Supp. at 426; *Houston*, 663 F.Supp. at 356–58.

### 1.

Although "a finding that city officials *are* responsive to the concerns of minority residents is not enough, by itself, to defeat a voting dilution claim," *Westwego I*, 872 F.2d at 1213 n. 15 (emphasis in original), it is a factor which, for several reasons, this court finds persuasive in this case. First, it is unrefuted that the County has recently paved and/or repaved roads in predominately black neighborhoods. Although Ms. Brown may not be pleased with the end result, she cannot deny that the County has attempted to alleviate or rectify *known* problems. It is unrealistic and unfair for her to complain to this court that culverts need installing or that the road repairs are substandard when she candidly admits failing to bring these concerns to the attention of her supervisor or any other County official. Second, it has been stipulated that blacks hold appointive positions on approximately one-third of the County Boards and Commissions. This figure is in line with the total black population of the County and represents, in this court's mind, a concern that blacks be afforded a voice in matters affecting the citizenry. Finally, the County, in appointing the biracial committee and holding public hearings on the proposed redistricting plan, made a concerted effort to comply with the mandates of the Voting Rights Act. From the beginning, Calhoun County recognized the need for redistricting and attempted to procure Section 2 compliance via an open, public forum. The black members appointed to the biracial committee were, according to the testimony, well respected and influential citizens in the black community; some, like Ms. Rose, were college educated. These are not the actions of a county which is oblivious to the needs and concerns of the black community or disrespectful of the mandates of the Voting Rights Act.

### 2.

This court has previously held that "the strength of the underlying policy is ... relevant because a finding of discriminatory intent may provide circumstantial evidence that the particular electoral device produces discriminatory results. Further-

more, a tenuous justification for a policy may also indicate that the policy itself is unfair." *Houston,* 663 F.Supp. at 356. *See also Magnolia Bar Association,* 793 F.Supp. at 1412 (court found that legitimate state policies may be given significant weight, although they do not automatically outweigh proof of racial vote dilution).

 In this case, defendants enunciated various reasons for establishing the Three Rivers criteria, *see supra* at 1192, and for adopting the supervisory plan now at issue. The court finds these to be legitimate County considerations. Much was made of road mileage in this case, and although Ms. Caridas opined that this was yet another way for diluting minority voting strength, the court believes, especially in a beat system of county government, that attempting to maintain districts with equal road mileage is nontenuous. When proposing redistricting plans, counties routinely consider similar matters. *See, e.g., Magnolia Bar Association,* 793 F.Supp. at 1417 ("proposed redistricting plans should maintain historical, geographical or political boundaries"). In this way, confusion and hardship is lessened and, in the words of Mr. Kelly, the "total[ ] tear[ing] up" of a county is avoided.

## CONCLUSION

In sum, the court finds that plaintiffs have failed to meet the three necessary preconditions to establishing a Section 2 claim. Specifically, the court is of the opinion that plaintiffs have not proved that a geographically compact black majority district can be created. Assuming that plaintiffs have crossed this threshold, the court finds that under the totality of the circumstances, plaintiffs have not shown that as a result of the adopted supervisory plan, they do not have equal opportunity to participate in the political process and to elect candidates of their choice.

This court cannot close this opinion, however, without quoting the following language from *Turner:*

> The idea that race or ethnicity, or language, or religion might become the basis for distributing voters during the periodic redistricting processes runs counter to our professed belief in the "oneness" of American political life and to the belief in Democracy itself with its emphasis on the individual citizen. There is no one coherent political philosophy, political principle or political program subsumed under such group labels as "black citizens," "white citizens," "Asian citizens," or "Hispanic citizens." Historically we Americans have opted to pursue the ideal of equal political opportunity for each individual citizen. The standard is "one person, one vote." When we speak in terms of "group political rights" for such categories of voters we are immediately in deep water, for so much of real political significance may be hidden under such group labels. Do we not denigrate the importance of the individual, and that individual's independent, complex, political views, when we, on the basis of skin color alone, casually lump him or her into some "cohesive" group during the redistricting process?
>
> \* \* \* \* \* \*
>
> The only political unit in our democracy that has any consistent coherency or integrity is the individual citizen voter.

*Turner,* 784 F.Supp. at 562 (footnote omitted).

A final judgment shall issue.