**James H. CLARK, et al., Plaintiffs**

**v.**

**CALHOUN COUNTY, MISSISSIPPI, et al., Defendants.**

**No. 3:91CV65–S–D.**

United States District Court, N.D. Mississippi, Western Division.

April 6, 1995.

---

**10.** *See EP Operating,* 26 F.3d at 569.

Ellis Turnage, Cleveland, MS and Robert B. McDuff, Jackson, MS, for plaintiffs.

Cliff R. Easley, Jr., Bruce, MS, for defendants.

*OPINION*

SENTER, Chief Judge.

This Section 2 Voting Rights Act case is presently before the court following vacation and remand from the United States Court of Appeals for the Fifth Circuit. *See Clark v. Calhoun County, Mississippi,* 21 F.3d 92 (5th Cir.1994) (*Clark II* ). In that opinion, the court concluded that remand was necessary "[b]ecause the district court's findings regarding the geographic compactness of the black population in Calhoun County are not sufficiently particularized, and because the court's findings regarding racial polarization are not definitive.... " *Clark,* 21 F.3d at 97. It also vacated this court's alternative holding regarding the totality of the circumstances with instructions to reconsider those findings "[a]fter reconsidering the evidence of racially polarized in the context of the *Gingles* factors." *Id.* This court has reviewed its original opinion, *see Clark v. Calhoun County, Mississippi,* 813 F.Supp. 1189 (N.D.Miss.1993) (*Clark I* ), and though perplexed by the appellate opinion, attempts, with the aid of the parties, to answer that court's questions.

### I. Geographical Compactness

In its previous ruling, this court found that "[a]lthough plaintiffs have proved that the black population of Calhoun County is sufficiently large enough to constitute a majority in one district, they have failed to prove that this same majority group is geographically compact." *Clark I,* 813 F.Supp. at 1197–98. The Fifth Circuit questioned this holding, noting (1) that "the district court erred in finding that the loss of influence [of black voters not in the majority black district] supported its conclusion that the black population in Calhoun County was not geographically compact," *Clark II,* 21 F.3d at 95; (2) that plaintiffs' proposed plan "is not cast in stone [but] was simply presented to demonstrate that a majority-black district is feasible in Calhoun County," *id.;* and (3) that it could not properly review this court's finding regarding the diverse interests of the populace of certain municipalities because "[the court] failed to explain the nature of the 'diverse interests' and why they are so significant that plaintiffs' proposed district could not be effectively represented." *Id.* at 96.

The court therefore turns its attention to the ultimate question of whether blacks in Calhoun County are sufficiently geographically compact to constitute a majority in a single-member district. Along the way, the court feels compelled to make some additional observations.

■ The court realizes that plaintiffs' proposed plan was not "cast in stone." However, it was plaintiffs' burden, not the court's, to prove by a preponderance of the evidence

that the black population of Calhoun County is geographically compact. At trial plaintiffs chose to focus their attention on a "super-majority" black district which, though not as egregious as the North Carolina districts in *Shaw,* fingered its way through portions of the county extrapolating black voters and packing them into one district simply because of their race. *See Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511, 529 (1993) ("[R]eapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid"). As a result, plaintiffs only proved that a majority-black district could be created in Calhoun County.

■ But *Gingles* requires more. To pass the first factor, plaintiffs must prove that the minority group is sufficiently large *and geographically compact* to constitute a majority in a single-member district. At trial, plaintiffs failed in this burden. Though the Fifth Circuit did not reverse this court's findings on the first *Gingles* factor, the upshot of its opinion is clear and results in plaintiffs gaining a second opportunity to carry that burden. Had plaintiffs introduced into evidence the plans they present on post-remand, they would have succeeded, as they do now, in convincing the court that a geographically compact majority black district can be created in Calhoun County. In reaching this conclusion, the court does not discount defendants' concerns about (1) placing Calhoun City and Bruce, both of which have large black populations, in the same district, (2) equalizing road mileage among the districts, or (3) maintaining cohesive neighborhoods. But these are matters which can be remedied by defendants if the court concludes the existing plan violates section 2.

■ Finally, although this court may have erred in reasoning that its ruling on the first *Gingles* factor was supported by the effect of the proposed super-majority black district on the voting strength of the other black citizens, it nevertheless believes this continues to be an important factor in assessing the viability of any redistricting plan. *See Thornburg v. Gingles,* 478 U.S. 30, 46 n. 11, 106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25 (1986) ("Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority").

## II. Racial Polarization

In *Clark I,* this court found:

[T]here can be *no conclusion except* that racial bloc voting did exist in Calhoun County. Although the steady increase in black officeholders in the County *cannot remove the statistically-based conclusion* presented by plaintiffs, it clearly evidences . . . that racial polarization and racial bloc voting are steadily but surely coming to an end in Calhoun County.

*Clark I,* 813 F.Supp. at 1198. Later in that opinion, this court, in considering the totality of the circumstances, stated:

[A]lthough [*the racial polarization factor*] *technically weighs in plaintiffs' favor,* the court cannot disregard the success that black candidates have experienced in two predominately white municipalities or Ms. Steen's election to a County office from an overwhelmingly white district. In this court's view, these elections indicate a steady diminution of racially polarized voting and demonstrate that the electorate will vote for the most qualified candidate, regardless of race.

*Id.* at 1200.

On appeal, the Fifth Circuit concluded: The district court . . . is not obliged to accept plaintiffs' statistical evidence as conclusive on the question of whether racially polarized voting exists in Calhoun County. However, when the statistics are the principal evidence offered by plaintiffs and when the statistics have at least surface plausibility, the district court must ensure that it thoroughly discusses its reasons for rejecting that evidence.

Moreover, the evidence presented by defendants in response to plaintiffs' statistical evidence has limited relevance.

\* \* \* \* \* \*

[I]n analyzing voting patterns in Calhoun County, the district court should accord greater weight to the virtual absence of black electoral success in county-wide elections as opposed to their limited electoral success in municipal elections.

*Clark II,* 21 F.3d at 96–97. Therefore, "[i]f the court finds that [the first *Gingles* ] precondition has been satisfied, it should then make definitive findings regarding the evidence of racially polarized voting in Calhoun County." *Id.* at 97.

The court is confused about this task, as it did not "reject" plaintiffs' statistical evidence on racially polarized voting—it was uncontradicted. However, the court certainly did temper the import of the cold numbers by reference to other matters, such as the election of blacks to municipal positions. These matters, considered of "limited relevance" by the appeals court, did not, however, alter the fact that plaintiffs successfully proved the existence of racial bloc voting in Calhoun County. The court is unsure how to be more definitive than that. *But see League of United Latin American Citizens v. Clements,* 999 F2d 831, 850–61, 858 n. 26 (5th Cir.1993) (plaintiffs must show more than divergent voting patterns among white and black voters to establish legally significant bloc voting), *cert. denied,* — U.S. —, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

### III. Totality of the Circumstances

■ In its initial opinion, this court, after assuming that plaintiffs had crossed the *Gingles* threshold, considered the totality of the circumstances, concluding that "plaintiffs have not shown that as a result of the adopted supervisory plan, they do not have equal opportunity to participate in the political process and to elect candidates of their choice." *Clark I,* 813 F.Supp. at 1202. The Fifth Circuit vacated that holding "given the key role that racially polarized voting plays in the totality of the circumstances inquiry...." *Clark II,* 21 F.3d at 97. It then cited a Third Circuit case which stands for

the proposition that " 'it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances.' " *Id.* (quoting *Jenkins v. Red Clay Consolidated School District,* 4 F.3d 1103 (3d Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994)).

The import of the Fifth Circuit's citation to that statement in *Jenkins* is unmistakable. However, that sweeping proposition by the *Jenkins* court actually concluded with a refusal to "rule out that possibility on remand...." *Jenkins,* 4 F.3d at 1135–36. *See also id.* at 1116 n. 6 ("While it would be a highly unusual case in which a plaintiff successfully proved the existence of the three *Gingles* factors and still failed to establish a violation, we cannot rule out that possibility entirely"). The possibility that plaintiffs might fail in a Voting Rights challenge even though they prove the existence of the *Gingles* factors has been specifically recognized by the United States Supreme Court in *Johnson v. De Grandy,* — U.S. —, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). In that case, the Court rejected the notion that establishment of the *Gingles* factors was sufficient to prove a section 2 violation:

But if *Gingles* so clearly identified the three [factors] as generally necessary to prove a § 2 claim, it just as clearly declined to hold them sufficient in combination, either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution. This was true not only because bloc voting was a matter of degree, with a variable legal significance depending on other facts, but also because the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts. Lack of electoral success is evidence of vote dilution, but courts must also examine other evidence in the totality of circumstances, including the extent of the opportunities minority voters

enjoy to participate in the political processes.... [A]lthough lack of equal electoral opportunity may be readily imagined and unsurprising when demonstrated under circumstances that include the three essential *Gingles* factors, that conclusion must still be addressed explicitly, and without isolating any other arguable relevant facts from the act of judgment.

If the three *Gingles* factors may not be isolated as sufficient, standing alone, to prove dilution in every multimember district challenge, *a fortiori* they must not be when the challenge goes to a series of single-member districts, where dilution may be more difficult to grasp.... As facts beyond the ambit of the three *Gingles* factors loom correspondingly larger, factfinders cannot rest uncritically on assumptions about the force of the *Gingles* factors in pointing to dilution.

*De Grandy,* —— U.S. at —— – ——, 114 S.Ct. at 2658, 129 L.Ed.2d at 791–92.

This court therefore declines to accept the Fifth Circuit's invitation to find a section 2 violation simply because plaintiffs have prevailed on the *Gingles* factors and proceeds to reconsider the totality of the circumstances as instructed by that court. Although the Fifth Circuit directed its attention only on the racial polarization factor, the court has reviewed its other findings as well but discerns no error therein and therefore turns its eye, as did the appellate court, to racial polarization. The court's discussion of that factor is naturally limited, however, since, as previously discussed, the court found a racially polarized electorate in Calhoun County in its first consideration of this case and does not now deviate from that holding. Even though the court recognizes the important role that racial polarization plays in the totality of the circumstances inquiry, it continues to believe that, when all the circumstances are considered, "plaintiffs have not shown that as a result of the adopted supervisory plan, they do not have equal opportunity to participate in the political process and to elect candidates of their choice." *Clark I,* 813 F.Supp. at 1202.

## CONCLUSION

Having carefully considered the matter and paying particular attention to the concerns of the Fifth Circuit in its remand opinion, the court finds that plaintiffs have proved that a geographically compact majority black district can be created in Calhoun County and that racially polarized voting exits therein. The court nevertheless finds that, under the totality of the circumstances, plaintiffs have not proved a violation of Section 2 of the Voting Rights Act.

An appropriate final judgment shall issue.

## *FINAL JUDGMENT*

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

That the redistricting plan at issue and presently in place in Calhoun County, Mississippi, does not violate Section 2 of the Voting Rights Act;

That judgment is hereby entered in favor of defendants, and this cause is dismissed with prejudice.

SO ORDERED.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On or about February 15, 1995, plaintiffs moved for a preliminary injunction to postpone the March 1 filing deadline for board of supervisor elections. As that deadline has passed and as this court has, by separate opinion and order entered this date, found that the existing redistricting plan does not violate Section 2 of the Voting Rights Act, the motion is not well taken and is **denied.**

SO ORDERED.