United States Court of Appeals,

Fifth Circuit.

No. 93-7001.

Bernard TEAGUE, Leroy Gladney and L.B. Winters, Plaintiffs-
Appellants,

v.

ATTALA COUNTY, MISSISSIPPI, et al., Defendants-Appellees.

April 1, 1994.

Appeal from the United States District Court for the Northern
District of Mississippi.

Before POLITZ, Chief Judge, JONES, Circuit Judge, and FULLAM,[*]
District Judge.

PER CURIAM:

In this Section 2 voting rights case and one person-one vote

case, the district court found that appellants failed to carry

their burden of proof 807 F.Supp. 392.  Although we are persuaded

that the court did not clearly err in rejecting the one person-one

vote claim,[1] the court's findings in regard to the vote dilution

claim were incomplete.  Consequently, to this extent, we vacate and

remand for further consideration.

Appellants contended that the single-member redistricting plan

for Attala County's five supervisors, five election commissioners,

and two justice court judges diluted the influence of the county's

407 black voting age population in violation of Section 2 of the

Voting  Rights  Act  and  under-weighted  votes  contrary  to  the

_____

[*]District Judge of the Eastern District of Pennsylvania,
sitting by designation.

[1]No more need be said about the equal protection claim.

1

fourteenth amendment.  As a result, no black citizen has been elected to county-wide office in modern times.  Blacks have been elected as county supervisor or county election commissioner from a majority-black district only as a result of the favorable 1980 redistricting.  When the county attempted to redistrict after the 1990 census, it rejected the U.S. Justice Department's insistence that its redistricting include two rather than one majority-black district.  Instead, Attala County chose simply to use existing districts.

At trial, appellants used statistical evidence to prove their case.  They attempted to show that in white-majority precincts (807 plus white), during eight elections between white and black candidates, an average of only 127 of the white voters voted for the black candidates.  White voters in these precincts never gave support to a black candidate in a contested election for county office.  In addition to this "extreme case analysis", they offered evidence of racial polarization in the form of an ecological regression analysis.  The regression analysis considered eight elections that pitted black against white candidates.  In the majority-white district analyzed, appellants' experts contended that 877 of black voters supported black candidates while only 157 of white voters did so.  This statistical evidence, together with the relative lack of black candidate success in Attala County, formed the core of appellants' case.

Both parties offered considerable additional evidence in contesting the two disputed *Gingles* issues:  whether the minority

2

group is politically cohesive, and whether the white majority vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Thornburg v. Gingles,* 478 U.S. 30, 50-51, 106 S.Ct. 2752, 2759-60, 92 L.Ed.2d 25 (1986).[2]  The Supreme Court has held the *Gingles* factors equally applicable to challenges to single-member districts as to multi-member districts. *Growe v. Emison,* 507 U.S. ----, ----, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993); *Voinovich v. Quilter,* 507 U.S. ----, ----, 113 S.Ct. 1149, 1157, 122 L.Ed.2d 500 (1993).  In *Voinovich,* the Court explained the dynamics of vote dilution as applied to minority vote "fragmentation" or "packing":

> In the context of a single-member districts, the usual device for diluting minority voting power is the manipulation of district lines.  A politically cohesive minority group that is large enough to constitute the majority in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority.  Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice:  If the majority in each district votes as a bloc against the minority candidate, the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory.
>
> ... How such concentration or "packing" [of minority voters within a district] may dilute minority voting strength is not difficult to conceptualize.  A minority group, for example, might have sufficient numbers to constitute a majority in three districts.  So apportioned, the group inevitably will elect three candidates of its choice, assuming the group is sufficiently cohesive.  But if the group is packed into two districts in which it constitutes a super-majority, it will be assured only two candidates.

---

[2]The first *Gingles* standard, that the minority is sufficiently large and compact to constitute a majority in a single member district, is not disputed. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

The district court, in rejecting appellants' contentions, held that appellants did not prove racial polarization in voting, and it noted that their "extreme case analysis" only included 80%-plus white precincts and therefore demonstrated only *white* cohesion. In a later part of the opinion, he summarily dismissed appellants' regression analysis as "non-demonstrative." In the alternative, the court found that even if voting in Attala County was racially polarized, in the totality of circumstances, blacks still have equal opportunity to elect representatives of their choice. The court cited black candidates' successes in majority-black districts and gradual improvements in the economic condition of black residents, blaming any black electoral failures on voter apathy.

The district court is not obliged to accept statistical evidence as conclusive on the question whether racially polarized voting exists. *Magnolia Bar Association, Inc. v. Lee,* 994 F.2d 1143, 1149 (5th Cir.1993) ("the plaintiffs have not offered any authority, and we can find none, for their assertion that the district court may only rely on expert conclusions in determining whether white bloc voting is legally significant or whether elections in which whites do not vote as a bloc are an aberration.") But in making its intensely fact-specific inquiry here, the district court ought to have discussed appellants' statistical evidence more thoroughly because that was the principal evidence they offered and because their statistics had at least surface plausibility. Further, the district court findings on the subjects of racial polarization and minority political cohesion are

4

broad and general and not explicitly tied to the testimony, although many witnesses were called in the case.

This court is unable to discharge our appellate function in voting rights cases without more guidance by the trial court concerning its credibility choices on the welter of evidence before it. *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201 (5th Cir.1989); *Velasquez v. City of Abilene,* 725 F.2d 1017, 1020-21 (5th Cir.1984) (court must discuss all the substantial evidence contrary to its opinion). Consequently, we must reverse and remand to obtain revised findings of fact and conclusions of law that will directly evaluate appellants' statistical evidence and will more comprehensively refer to the other evidence in the record, tying that evidence directly to the *Gingles* preconditions in light of *Growe* and *Voinovich.* In so doing, of course, we do not intimate any view on the merits of the court's credibility choices or its ultimate conclusion.

For the foregoing reasons, the district court's judgment is VACATED and REMANDED in regard to the Section 2 Voting Rights Act claim; it is AFFIRMED in regard to the fourteenth amendment claim for redistricting based on the one person-one vote principle.

AFFIRMED in part, VACATED and REMANDED in part.