United States Court of Appeals,

Fifth Circuit.

No. 93-7118.

James H. CLARK and Barbara Brown, Plaintiffs-Appellants,

v.

CALHOUN COUNTY, MISSISSIPPI, et al., Defendants-Appellees.

May 24, 1994.

Appeal from the United States District Court for the Northern District of Mississippi.

Before POLITZ, Chief Judge, and KING and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs challenge the redistricting plan for Calhoun County, Mississippi under § 2 of the Voting Rights Act. The district court agreed with defendants that the black population in Calhoun County was not sufficiently geographically compact to form a majority-black district. Because the court's findings in this regard are not sufficiently particularized, we vacate and remand for further findings consistent with this opinion.

I.

Plaintiffs, James H. Clark and Barbara Brown, are black residents and registered voters in Calhoun County, Mississippi. They challenge the county's election districts under § 2 of the Voting Rights Act. County supervisors, county election commissioners, and members of the board of education are elected from the five election districts in Calhoun County. The named defendants are: Calhoun County; the Calhoun County Democratic Executive Committee; the Calhoun County Republican Executive

1

Committee;  and the Calhoun County Election Commission.

In February 1991, following the release of the 1990 Census, the Calhoun County Board of Supervisors engaged Three Rivers Development and Planning District of Pontotoc, Mississippi ("Three Rivers") to develop a redistricting plan for the county.  At the same time, the Board of Supervisors appointed a 10-member biracial committee (made up of one black citizen and one white citizen from each election district) "to act as a supervisory committee to the said Three Rivers ... and to assist in dissemination of information to the public."

The biracial committee met with Three Rivers in March 1991, and approved one of the planning company's proposals for redistricting.  After a televised public hearing during which a representative of Three Rivers explained the need for redistricting and the changes being suggested, the Board of Supervisors adopted the plan approved by the biracial committee.  The plan then was submitted to the Justice Department for preclearance pursuant to § 5 of the Voting Rights Act.  In July 1991, the Justice Department advised the county that the Attorney General had no objections to the plan.

Plaintiffs filed suit on August 7, 1991, alleging that the redistricting plan violated § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution.[1]  Plaintiffs argued

_____

[1]This appeal only raises issues under § 2 of the Voting Rights Act and does not involve plaintiffs' constitutional claims.

that the redistricting plan should have included a majority-black district given that black citizens comprise 27.017 of the general population and 23.477 of the voting-age population of Calhoun County. Under the redistricting plan, the largest concentration of black citizens is in District 4, where they comprise 427 of the population (see Appendix A). In support of their case, plaintiffs prepared a hypothetical districting plan which included a district with a 74.97 black majority (see Appendix B).

A three-day bench trial was held in November 1992. At trial, it was established that no black candidate has been elected in this century in Calhoun County as supervisor, justice court judge, constable, sheriff, circuit clerk, chancery clerk, tax assessor, superintendent of education, school board member, coroner, county attorney, state senator, or state representative. The evidence also showed that, since 1980, twelve black candidates have run unsuccessfully for justice court judge, constable, sheriff, and school board member. The only black candidate to be elected to county-wide office during this time was Sheila Steen, who ran unopposed for Election Commissioner of District 3.

Plaintiffs' expert in racial bloc voting, Cheri McKinless, testified that racial polarization exists in Calhoun County. She testified that, in black versus white elections, black citizens vote as a bloc for the black candidate, and white citizens tend to vote for the white candidate. According to Ms. McKinless, for black citizens to elect their preferred candidate to county-wide office, they must comprise a majority of the voting-age population

3

in a given district. Ms. McKinless asserted that: "if the black candidate is getting no support from the white population, there is no way a black candidate can be elected under the current system." In response, defendants showed that three black candidates had been elected to the Board of Aldermen for Bruce, the largest municipality in Calhoun County, and that one black candidate had been elected to the Board of Aldermen for Vardaman, the fourth-largest municipality in the county.

After considering the evidence presented, the district court concluded that plaintiffs had failed to establish that the redistricting plan violated § 2 of the Voting Rights Act. See *Clark v. Calhoun County,* 813 F.Supp. 1189, 1202 (N.D.Miss.1993). The court's ruling was bottomed primarily on its conclusion that "plaintiffs have not proved that a geographically compact black majority district can be created." Id. Alternatively, the court held that a § 2 violation had not been established under the "totality of circumstances." Id. On appeal, plaintiffs challenge both of these conclusions; we consider their arguments below.

II.

A.

Section 2 of the Voting Rights Act, as amended, provides that: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. 1973(a). To

4

establish a § 2 violation, members of the protected class must demonstrate that, based on the totality of circumstances, they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. 1973(b).

In *Thornburg v. Gingles,* 478 U.S. 30, 48-51, 106 S.Ct. 2752, 2765-67, 92 L.Ed.2d 25 (1986), the Supreme Court held that a plaintiff must demonstrate three "preconditions" in order to establish that an at-large voting scheme dilutes minority voting strength and therefore violates § 2. The minority group must demonstrate that: (1) it is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances—usually to defeat the minority's preferred candidates. Id. The Supreme Court recently held that the same preconditions apply to challenges to single-member districts. See *Growe v. Emison,* --- U.S. ----, ---- - ----, 113 S.Ct. 1075, 1084-85, 122 L.Ed.2d 388 (1993).

In this case, the district court found that plaintiffs had failed to establish the first Gingles precondition, reasoning that:

> Although plaintiffs have proved that the black population of Calhoun County is sufficiently large enough to constitute a majority in one district, they have failed to prove that this same minority group is geographically compact. Under plaintiffs' proposed plan, blacks from three separate and distinct municipalities, each having diverse interests, were extracted to form District 1. This exercise results in extreme gerrymandering, plaintiff's proposed black district having been "drawn in an unusual or illogical manner to enhance the voting power of a particular ... voting bloc at

5

> the expense of other individuals or groups who would be elected or help elect the candidates of their choice." *Magnolia Bar Association, Inc. v. Lee,* 793 F.Supp. 1386, 1396 n. 11 (S.D.Miss.1992).... In this court's opinion, under plaintiffs' proposal, the voting strength of blacks not included in District 1 would be diluted to such an extent that they would have less opportunity to participate in the political process and to elect members of their choice.

813 F.Supp. at 1197-98.

We note initially that the district court's suggestion that the formation of plaintiffs' proposed district would dilute the voting strength of black citizens in the remaining districts does not support its conclusion that the black population in Calhoun County is not sufficiently geographically compact. Whenever a majority-black district is created to remedy a § 2 violation, the number of black voters in the other districts must necessarily be reduced. Indeed, without this phenomenon, no majority-black districts would ever be created. Because the record in this case reflects no loss of influence that is not found in every § 2 case, the district court erred in finding that the loss of influence supported its conclusion that the black population in Calhoun County was not sufficiently geographically compact.

We address next the district court's concerns about the shape or configuration of the proposed district. The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district. See, e.g., *De Grandy v. Wetherell,* 815 F.Supp. 1550, 1569 (N.D.Fla.1992) (three-judge court) ("compactness is not an aesthetic concept"), prob. juris. noted, --- U.S. ----, 113 S.Ct. 1249, 122 L.Ed.2d 648

6

(1993).  Moreover, plaintiffs' proposed district is not cast in stone.   It was simply presented to demonstrate that a majority-black district is feasible in Calhoun County.  If a § 2 violation is found, the county will be given the first opportunity to develop a remedial plan.  See *Westwego Citizens for Better Gov't v. City of Westwego,* 946 F.2d 1109, 1124 (5th Cir.1991) ("*Westwego III*").

Defendants argue that the Supreme Court's decision in *Shaw v. Reno,* --- U.S. ----, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), supports the district court's finding that plaintiffs have not established the first *Gingles* precondition.  In *Shaw,* the Court held that plaintiffs state a claim under the Equal Protection Clause, and trigger strict scrutiny, by alleging that a voting scheme is "so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles and without sufficiently compelling justification."  Id., --- U.S. at ----, 113 S.Ct. at 2824.  However, the proposed district in this case (see Appendix B) is not nearly as bizarre as the district under consideration in *Shaw.*  We therefore need not decide whether a bizarrely-shaped district which would enable plaintiffs to state a claim under the Equal Protection Clause would necessarily flunk the *Gingles* compactness test.[2]

---

[2]The district court, of course, retains supervision over the final configuration of the districting plan.  See *Westwego III,* 946 F.2d at 1124.  As such, the court should ensure that any remedial plan is "consistent with the spirit of *Shaw.*"  *Jeffers v. Tucker,* --- F.Supp. ----, ----, 1994 WL 71471, at *6

The district court also found that the black population in Calhoun County was not sufficiently geographically compact because: "Under plaintiffs' proposed plan, blacks from three separate and distinct municipalities, each having diverse interests, were extracted to form [plaintiffs' proposed majority-black district]." A number of courts have concluded that the first *Gingles* precondition is not satisfied if the proposed district does not retain a natural sense of community such that it can be effectively represented. See, e.g., *East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson,* 691 F.Supp. 991, 1007 (E.D.La.1988). However, we cannot properly review the district court's finding because it failed to explain the nature of the "diverse interests" and why they are so significant that plaintiffs' proposed district could not be effectively represented. We therefore are compelled to vacate the district court's judgment and remand to allow the court to make further findings on the compactness issue.

If the court finds, upon reconsideration, that the black population in Calhoun County is sufficiently compact, it should then make definitive findings on the second and third *Gingles* factors—the political cohesiveness of the black community and the ability of the white majority usually to defeat the minority's preferred candidate. As the district court correctly noted, these two factors are ordinarily established through evidence of racially

(E.D.Ark.1994) (three-judge court). The court should make sure that any remedial plan is narrowly tailored to correct any § 2 violation found to exist in Calhoun County. See *Hays v. State of Louisiana,* 839 F.Supp. 1188, 1206-09 (W.D.La.1993) (three-judge court), appeal filed, 62 U.S.L.W. 3670 (Mar. 28, 1994).

polarized voting. See *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1207 (5th Cir.1989) ("*Westwego I* "). Despite recognizing that plaintiffs presented uncontradicted statistical evidence that racially polarized voting exists in Calhoun County, the district court found that:

> By limiting the analysis of racial bloc voting to the twelve black candidates suggested by plaintiffs, there can be no conclusion except that racial bloc voting did exist in Calhoun County. Although the steady increase in black officeholders in the County cannot remove the statistically-based conclusion presented by plaintiffs, it clearly evidences, together with other evidence presented by defendants, that racial polarization and racial bloc voting are steadily but surely coming to an end in Calhoun County.

813 F.Supp. at 1198.

The district court, of course, is not obliged to accept plaintiffs' statistical evidence as conclusive on the question of whether racially polarized voting exists in Calhoun County. See *Teague v. Attala County,* 17 F.3d 796, 798 (5th Cir.1994). However, when the statistics are the principal evidence offered by plaintiffs and when the statistics have at least surface plausibility, the district court must ensure that it thoroughly discusses its reasons for rejecting that evidence. See id.

Moreover, the evidence presented by defendants in response to plaintiffs' statistical evidence has limited relevance. First, the election of Ms. Steen to the county election commission was in an uncontested race that occurred while this litigation was pending. As the Supreme Court noted in *Gingles,* the election of some black candidates does not negate a § 2 claim and does not establish that polarized voting does not exist. 478 U.S. at 57, 75-76, 106 S.Ct.

9

at 2769-70, 2779-80. The Court noted that this was particularly true when the election was unopposed and occurred after litigation had been initiated. Id., see also *Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1560 (11th Cir.1987) ("proof that the election of a minority candidate to political office occurred after initiation of a lawsuit could be a factor mitigating against a finding of increased minority electoral success"), cert. denied, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

Second, the municipal elections in Bruce and Vardaman do not demonstrate that black citizens have an equal opportunity to elect their preferred candidates to county-wide offices. As we have previously held, "elections involving the particular office at issue will be more relevant than elections involving other offices." *Magnolia Bar Ass'n v. Lee,* 994 F.2d 1143, 1149 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993); see also *Rangel v. Morales,* 8 F.3d 242, 245-46 (5th Cir.1993). Thus, in analyzing voting patterns in Calhoun County, the district court should accord greater weight to the virtual absence of black electoral success in county-wide elections as opposed to their limited electoral success in municipal elections.

In summary, because the district court's findings as to the first *Gingles* precondition are not sufficiently particularized, we vacate the court's judgment and remand for further findings on this issue. If the court finds that this precondition has been satisfied, it should then make definitive findings regarding the evidence of racially polarized voting in Calhoun County.

10

B.

Considering our remarks above remanding this case for further findings on the *Gingles* factors and given the key role that racially polarized voting plays in the totality of circumstances inquiry, see *Westwego III,* 946 F.2d at 1120, we also vacate the district court's alternative holding bottomed on the totality of circumstances. After reconsidering the evidence of racially polarized voting in the context of the *Gingles* factors, the district court should then reconsider its findings with respect to the totality of circumstances. As the Third Circuit recently explained:

> it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances. In such cases, the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act.

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 4 F.3d 1103, 1135 (3d Cir.1993), cert. petition filed, 62 U.S.L.W. 3396 (Nov. 17, 1993).

III.

Because the district court's findings regarding the geographic compactness of the black population in Calhoun County are not sufficiently particularized, and because the court's findings regarding racial polarization are not definitive, we vacate the court's judgment and remand for further consideration consistent with this opinion.

11

VACATED and REMANDED.

CA(94)2458-1,SIZE-1 PAGE,TYPE-PI

CA(94)2458-2,SIZE-1 PAGE,TYPE-PI