**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 93-7750
_____

BEATRICE HOUSTON, ET AL.,

Plaintiffs-Appellants,

versus

LAFAYETTE COUNTY, MISSISSIPPI, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
_____

ON SUGGESTION FOR REHEARING EN BANC

(Opinion May 4, 1995, 5 Cir., 51 F.3d 547)

(June 16, 1995)

Before KING, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Treating the Suggestion for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. No member of the panel nor Judge in regular active service of the Court having requested that the Court be polled on rehearing en banc (FRAP and Local Rule 35), the Suggestion for Rehearing En Banc is DENIED. However, in the interest of clarity, we withdraw our prior opinion, *Houston v. Lafayette County*, 51 F.3d 547 (5th Cir. 1995), and substitute the following:

Residents of Lafayette County, Mississippi, appeal from the district court's dismissal of their vote dilution challenge under § 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1988), to the redistricting plan for county supervisor elections as submitted by the County to the United States Department of Justice for preclearance. The district court found that the plaintiff residents had failed to prove that the black population was geographically compact, that black voters exhibited political cohesion, and that white voters voted in bloc to defeat minority candidates. We vacate the district court's judgment and remand for clarification.

I

County supervisors in Lafayette County are elected from five single-member election districts. Black residents constitute approximately one-quarter of the voting-age population and currently reside throughout the five districts. No black resident has ever been elected to the office of county supervisor. Black residents have been elected to sub-county positions such as constable and board of education member.

At trial, plaintiff residents used expert testimony and reports to prove their vote-dilution case. Plaintiffs' expert, Victoria Caridas, testified that black residents in Lafayette County could be placed in a majority-minority district, that is, a district where minority residents constituted a majority of the eligible voters. To demonstrate the feasibility of such placement,

2

she submitted two alternative plans that would achieve a 54-56% black voting-age majority in one district.

Plaintiffs' expert Dr. Allan Lichtman testified that black residents of Lafayette County exhibit political cohesion and that white residents of Lafayette County vote as a bloc to defeat minority candidates. In support of these conclusions, Dr. Lichtman testified that he used two statistical methods to analyze Lafayette County election data: bivariate ecological regression and extreme case analysis.[1] Dr. Lichtman analyzed fourteen primary elections using ecological regression and five primary elections using extreme case analysis.

The County's expert, Dr. Ronald Weber, also performed ecological regression and extreme case analysis on Lafayette County election data, although he did not analyze the same elections as Dr. Lichtman had. Based on his analysis, Dr. Weber concluded that racial polarization))that is, that black residents vote for black candidates and white residents vote for white candidates))does not occur in Lafayette County.

The district court found that the plaintiff residents had not shown that black residents were sufficiently geographically compact

---

[1] Bivariate ecological regression generates predictions of the correlation between election results and the race of the residents voting in the election. Statisticians use the correlations to estimate the percentages of black residents' and white residents' support for particular candidates. Extreme case analysis evaluates the actual election choices of voters in precincts whose residents are predominantly))80-90%-plus))of one race. Both methods of analysis utilize correlation coefficients and measures of statistical significance to determine the degree of confidence with which to view the estimates and predictions produced by the methods.

to allow formation of a majority-minority district.[2]  The court also found that black residents did not exhibit political cohesion and that white residents did not vote as a bloc to defeat minority candidates.  Alternatively, the district court found that, even if the plaintiff residents had proved geographical compactness, black political cohesion, and white bloc voting, they had failed nonetheless to prove that the totality of the circumstances showed that the County's plan diluted minority voting strength.  Plaintiff residents appeal the district court's decision, challenging each of the above findings.

**II**

Section 2 of the Voting Rights Act provides that:  "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ."  42 U.S.C. § 1973; *see also Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S. Ct. 2752, 2764, 92 L. Ed. 2d 25 (1986) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.").

In order to prove a § 2 violation, a plaintiff must

---

[2]     The district court described the plaintiff residents' plan as a "geographic game of gymnastics."

4

demonstrate three preconditions:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it))in the absence of special circumstances, such as the minority candidate running unopposed . . .))usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50-51, 106 S. Ct. at 2766-67. Although *Gingles* concerned at-large election districts, these preconditions also apply to challenges to single-member districting schemes. *Growe v. Emison*, ___ U.S. ___, ___, 113 S. Ct. 1075, 1084, 122 L. Ed. 2d 388 (1993) (extending *Gingles* preconditions to single-member district cases). If a plaintiff demonstrates the *Gingles* preconditions, the district court determines whether, under the totality of the circumstances, the plaintiff has proven the existence of vote dilution under the challenged plan. In doing so, the district court applies factors identified by the Senate Judiciary Committee Report accompanying the 1982 amendments to § 2. *Gingles*, 478 U.S. at 36-37, 106 S. Ct. at 2759.[3]

---

[3]  These factors are:

1.  the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2.  the extent to which voting in the elections of the state or political subdivision is racially polarized;

3.  the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.  if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.  the extent to which members of the minority group in the state or

5

We review the district court's findings with respect to the *Gingles* preconditions and the totality of the circumstances factors for clear error. *See Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991) (*Westwego III*) (reviewing findings in § 2 case for clear error); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1243 (5th Cir. 1988) (same), *cert. denied*, 492 U.S. 905, 109 S. Ct. 3213, 106 L. Ed. 2d 564 (1989). "[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 2d 746 (1948)).

---

political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S. Rep. No. 417, 97th Cong., 2d Sess. 28-29, *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07, *quoted in Gingles*, 478 U.S. at 36-37, 106 S. Ct. at 2759.

Plaintiff residents contend that the district court clearly erred in concluding that the black population of Lafayette County was not sufficiently geographically compact to allow the formation of a majority-minority district. They argue that our decision in *Clark v. Calhoun County, Miss.*, 21 F.3d 92 (5th Cir. 1994), mandates reversal.

Plaintiff residents challenge the district court's reasoning that "[t]he potential for increased minority influence that a majority composition of blacks within one district may afford is necessarily offset by the significantly diminished power of those left behind in the overwhelmingly white supervisor districts." We agree with the plaintiff's contention. As we stated in *Clark*:

> [T]he district court's suggestion that the formation of plaintiffs' proposed district would dilute the voting strength of black citizens in the remaining districts does not support its conclusion that the black population in [the county] is not sufficiently geographically compact. Whenever a majority-black district is created to remedy a § 2 violation, the number of black voters in the other districts must necessarily be reduced. Indeed, without this phenomenon, no majority-black districts would ever be created. Because the record in this case reflects no loss of influence that is not found in every § 2 case, the district court erred in finding that the loss of influence supported its conclusion that the black population in [the county] was not sufficiently geographically compact.

*Clark*, 21 F.3d at 95; *see also Campos*, 840 F.2d at 1244 ("The fact that there are members of the minority group outside the minority district is immaterial. . . . Just because not all of the minorities in [the city] are in the district does not mean that

7

*Gingles'* first part is not satisfied."). Accordingly, the district court's reasoning cannot support its finding that the black population is not geographically compact.

In *Clark*, as in this case, the district court rejected the plaintiffs' proffered districting plan as being too oddly shaped. Compactness, however, is not as narrow a standard as the district court construed it to be. "The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district." *Id.* at 95. Moreover, the question is not whether the plaintiff residents' proposed district was oddly shaped, but whether the proposal demonstrated that a geographically compact district *could be drawn*. *See id.* ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible in [the] county. If a § 2 violation is found, the county will be given the first opportunity to develop a remedial plan." (citations omitted)). Thus, although the edges of the plaintiff residents' proposed district look ragged in places, this does not automatically mean failure to meet the first *Gingles* precondition.[4]

As in *Clark*, the plaintiff residents' proposed district is not nearly as "bizarre" as those rejected in *Shaw v. Reno*, ___ U.S. ___, 113 S. Ct. 2816, 125 L. Ed. 2d 511 (1993), criticized in

---

[4] Plaintiff residents explain in their brief that their proposed plans used existing census block lines, which "lend themselves to irregular shapes."

8

*Growe*, ___ U.S. at ___, 113 S. Ct. at 1085-85, or invalidated in *Vera v. Richards*, 861 F. Supp. 1304, 1345 (S.D. Tex. 1994) (three-judge panel), *appeal filed*, 63 U.S.L.W. 3388 (U.S. Oct. 31, 1994). *See Shaw*, ___ U.S. at ___, 113 S. Ct. at 2826 (disapproving of reapportionment plan "so highly irregular that, on its face, it rationally cannot be understood as [being] anything other than [race-based]."). Indeed, the compactness of the district in the plaintiff residents' proposed plan resembles that of many districts considered constitutionally acceptable by other courts. *See, e.g., Vera*, 861 F. Supp. at 1345 (approving districts the shape of which was "at least not highly irregular apart from the small racially distinct appendages"); *see also* Richard G. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election District Appearances After* Shaw v. Reno, 92 Mich. L. Rev. 483, 542 fig. 2(d), 544 fig. 2(e), 545 fig. 3(a), 547 fig. 3(d) (1993) (explaining that districts of similar compactness to that proposed in this case satisfy the first *Gingles* precondition). Lastly, the district in the plaintiff residents' proposed plan is not substantially less compact than districts--which the County asserts are compact--in the County's 1982 and 1991 plans. *See* Defendants' Exhibits 1(a), 1(b), 10, 16 (1982 and 1991 County redistricting maps). The district court should have focused on the size and *concentration* of the minority population, rather than only on the shape of the districts in the plaintiff residents' specific proposals. Accordingly, we hold that the district court

9

clearly erred in finding that the black population of Lafayette County was not sufficiently geographically compact, based on its articulated rationale. Accordingly, we reverse and remand to the district court for further findings on this precondition.

## B

Plaintiff residents further contend that the district court clearly erred in concluding that they had failed to satisfy the second and third *Gingles* preconditions because voting in Lafayette County does not exhibit signs of racial polarization. The plaintiffs' expert, Dr. Lichtman, used both bivariate ecological regression and extreme case analysis to show black political cohesion and white bloc voting. The district court, however, viewed the plaintiff residents' proof on these elements as limited to the extreme case analysis, stating that "[t]o determine voter preference, . . . Lichtman relied on extreme case analysis."

The district court criticized Lichtman's analysis because Lichtman could use extreme case analysis only on 80%-plus white-majority precincts.[5] In the district court's view, "[w]ithout containing any heavily black precincts, Plaintiffs' analysis is incomplete: it sheds no light on and offers little proof of either black political cohesiveness or the preferred candidate of blacks." The district court's commentary on Lichtman's ecological regression consists merely of a statement that such studies are "nondemonstrative of a minority vote dilution claim" and "did not

_____

[5]     Lafayette County has no 80%-plus black-majority precincts.

10

encompass other factors and variables that provide further insight to voting behaviors and patterns."  The district court favored the statistics of Dr. Weber, the defendants' expert, because he "incorporated other acceptable research methods associated with history, and the political and social sciences."

Plaintiff residents correctly state that we vacated this district court's similar approach in *Teague v. Attala County*, 17 F.3d 796 (5th Cir. 1994).  In *Teague*, the district court rejected the plaintiffs' statistics summarily, and we vacated the judgment because the district court had neither addressed the statistical evidence nor provided this court with sufficiently particularized findings such that we could conduct a proper appellate review. "[I]n making its intensely fact-specific inquiry here, the district court ought to have discussed appellants' statistical evidence more thoroughly because that was the principal evidence they offered and because their statistics had at least surface plausibility."  *Id.* at 798.

We conclude that the district court's findings in this case suffer the same flaws as its findings in *Teague*.  First, the district court should have considered Lichtman's ecological regression probative of the issues of black political cohesion and white bloc voting.  *See Gingles*, 478 U.S. at 52-53, 106 S. Ct. at 2767 (approving of use of extreme case analysis and bivariate ecological regression analysis to prove racially polarized voting). Second, the district court should not have rejected summarily the

11

plaintiff residents' statistics on the grounds that they "look[ed] strictly at how, rather than why, people vote the way they do." While "evidence that divergent voting patterns are attributable to partisan affiliation or perceived interests rather than race [is] quite probative on the question of a minority group's future success at the polls," *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 859 (5th Cir. 1993), evidence that lacks such evaluation of the voters' possible motivations still carries probative value. The statistics the plaintiff residents offered have facial plausibility, and therefore the district court should have considered them. *Teague*, 17 F.3d at 798.[6]

Moreover, as in *Teague*, the district court's findings are too general to allow us to conduct our appellate review. *Id.* at 798 ("This court is unable to discharge our appellate function in voting rights cases without more guidance by the trial court concerning its credibility choices on the welter of evidence before

---

[6] *See also Clark*, 21 F.3d at 96 ("The district court, of course, is not obliged to accept plaintiffs' statistical evidence as conclusive on the question of whether racially polarized voting exists in [the county]. . . . However, when the statistics are the principal evidence offered by plaintiffs and when the statistics have at least surface plausibility, the district court must ensure that it thoroughly discusses its reasons for rejecting that evidence."); *Monroe v. City of Woodville*, 897 F.2d 763, 764 (5th Cir.) ("Statistical proof of political cohesion is likely to be the most persuasive form of evidence, although other evidence may also establish this phenomenon. . . . Nevertheless, courts must carefully examine statistical evidence of racial bloc voting to determine its relevance and probativeness [sic] to a finding of political cohesiveness." (citation omitted)), *cert. denied*, 498 U.S. 822, 111 S. Ct. 71, 112 L. Ed. 2d 45 (1990); *Westwego Citizens for Better Gov't v. Westwego*, 872 F.2d 1201, 1203-04 (5th Cir. 1989) (*Westwego I*) (criticizing district court for failing to note substantial contrary evidence and failing to "specify on which evidence it relied in *support* of its conclusions"); *Velasquez v. City of Abilene*, 725 F.2d 1017, 1020 (5th Cir. 1984) ("Although the trial court is not required to recount and discuss every bit of evidence offered to it, it is required to discuss all the substantial evidence contrary to its opinion.").

it.").[7] Although the district court may ultimately decide that the defendants' evidence wins this battle of statistics, the district court must at the very least thoroughly discuss its choices with specific references to the evidence proffered. *See Teague*, 17 F.3d at 798 (remanding for further clarification because "the district court findings on the subjects of racial polarization and minority political cohesion are broad and general and not explicitly tied to the testimony, although many witnesses were called in the case").[8] Accordingly, we vacate the district court's decision and remand for clarification of the racial-polarization and bloc-voting issues.[9]

## C

Given that we remand for further findings on the second and third *Gingles* preconditions, we also vacate the district court's alternative holding that the plaintiff residents did not show that, under the totality of the circumstances, the districting scheme in Lafayette County diluted minority votes. *See Clark*, 21 F.3d at 97 (vacating and remanding alternative holding because findings on underlying preconditions were vacated). On remand, if the district

---

[7]    Indeed, at least half of the analysis section of the district court's opinion in this case is identical to that in *Teague*.

[8]    *See also Westwego I*, 872 F.2d at 1204 ("The district court's findings are stated in a conclusory fashion, with virtually no reference to the evidence presented at trial.  While the district court may in fact have evaluated the evidence critically, the court's assessment of the evidence cannot be discerned from the record before us."); *Velasquez*, 725 F.2d at 1021 ("It may be that the court below did not consider such evidence substantial or did not credit its validity, but we are unable to determine from a silent record the thought processes of the court below.").

[9]    Because we remand for additional findings, we do not address plaintiffs' challenges to the district court's comments on multiple minority candidate races and crossover voting.

court determines that the plaintiff residents satisfy the *Gingles* preconditions, it should then evaluate their claim under the totality of the circumstances. *See Johnson v. DeGrandy*, ___ U.S. ___, ___, 114 S. Ct. 2647, 2657, 129 L. Ed. 2d 775 (1994) (explaining that proof of *Gingles* preconditions is necessary but not sufficient to establish a § 2 violation). We note that a totality of the circumstances discussion must contain more than the analysis provided in the opinion we have reviewed here. Specifically, the district court must consider and analyze each of the Senate Report factors and incorporated in *Gingles*. *East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 491 (5th Cir. 1991) ("In evaluating the totality of the circumstances, the court should consider the [Senate Report] factors listed . . . ."); *see also supra* note 1 and accompanying text (explaining and enumerating Senate Report factors).

## III

For the foregoing reasons, we VACATE the judgment of the district court with respect to the *Gingles* preconditions and the totality of the circumstances factors. We therefore REMAND for additional findings consistent with this opinion.


ENTERED FOR THE COURT:


_____
    United States Circuit Judge


14