Beatrice HOUSTON, et al., Plaintiffs,

v.

LAFAYETTE COUNTY, Mississippi, et al., Defendants.

No. CIV. A. 3:91CV108–D–D.

United States District Court, N.D. Mississippi, Western Division.

Aug. 24, 1998.

997

Ellis Turnage, Cleveland, MS, for Plaintiffs.

Hal S. Spragins, Hickman, Goza & Gore, Oxford, MS, for Defendants.

## OPINION

DAVIDSON, District Judge.

The issue the court presently addresses on remand from the United States Court of Appeals for the Fifth Circuit is whether the Plaintiffs in this action have successfully proven a violation of § 2 of the Voting Rights Act. For the reasons stated below, the court finds a § 2 violation and shall order the Defendants to develop a remedy to the violation.

The home of the main branch of the University of Mississippi, as well as the locale after which the writer William Faulkner modeled much of his fictional Yoknapatawpha County, Lafayette County is a primarily rural setting located in the center of the northern third of the State of Mississippi. According to the 1990 census, its total population is 31,826, and its racial composition is approximately 72 .9% white, 25.1% black, and 2.0% American Indian, Asian, Pacific Islander or other. Blacks constitute 21.1% of the County's voting age population of 25,217. The County is governed by a board of supervisors consisting of five supervisors elected from five single-member districts. Only once has a black candidate ever won a seat on the Lafayette County Board of Supervisors.

After the 1990 census, the Lafayette County Board of Supervisors determined that the supervisory district lines should be redrawn in order to adjust for slight shifts in population. The Board of Supervisors retained Three Rivers Planning and Development District (Three Rivers) to develop a redistricting plan. The plan Three Rivers devised divided the total population as follows: [1]

---

1. The court recognizes that the totals of the figures here differ slightly from the totals reflected in the percentages by race above. However, the differences are slight and immaterial to today's findings of fact and conclusions of law. The court notes that while the parties have not always agreed on exact figures for population totals and percentages in this litigation, most differences have also proved inconsequential.

| District | Total Pop. | White | Percentage | Non–White | Percentage |
|---|---|---|---|---|---|
| 1 | 6,377 | 4,694 | 73.6% | 1,683 | 26.4% |
| 2 | 6,297 | 4,734 | 75.2% | 1,563 | 24.8% |
| 3 | 6,369 | 4,164 | 65.4% | 2,205 | 34.6% |
| 4 | 6,433 | 4,027 | 62.6% | 2,406 | 37.4% |
| 5 | 6,350 | 5,532 | 87.1% | 818 | 12.9% |

On August 14, 1991, the Plaintiffs filed the present action against the County under *inter alia* § 2 of the Voting Rights Act of 1965, as amended, codified at 42 U.S.C. § 1973. After a bench trial held from May 24, 1993, to May 27, 1993, the court entered final judgment in favor of the Defendants as to the Plaintiffs' § 2 claim. *Houston v. Lafayette County, Miss.,* 841 F.Supp. 751 (N.D.Miss.1993). On appeal, the United States Court of Appeals for the Fifth Circuit vacated the ruling of this court and remanded the case for further findings as to both the preconditions and the merits of the action under § 2. *Houston v. Lafayette County, Miss.,* 56 F.3d 606 (5th Cir.1995). From June 16, 1998, to June 17, 1998, the court held an evidentiary hearing to supplement the record in light of 1995 county elections. Considering the evidence gathered at that hearing and the bench trial, as well as the parties' submissions on this matter, the court, guided on remand by the directions of the Fifth Circuit, now finds a violation under § 2.

■ Section 2 of the Voting Rights Act provides,

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). In *Gingles,* the Supreme Court provided three "necessary preconditions" for a § 2 claim:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed ...—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766; *see also Growe v. Emison,* 507 U.S. 25, 40–41, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (extending preconditions to single-

member-district cases). "If a plaintiff demonstrates the Gingles preconditions, the district court determines whether, under the totality of the circumstances, the plaintiff has proven the existence of vote dilution under the challenged plan." *Houston v. Lafayette County, Miss.*, 56 F.3d 606, 609–10 (5th Cir. 1995). The factors to consider in this determination include the following:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the *opportunity for discrimination* against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are: whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and whether the policy underlying the state or political subdivision's use of such voting qualification,

prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2759.

### First Precondition—Compactness

■ The compactness precondition "does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district." *Clark v. Calhoun County, Miss.,* 21 F.3d 92, 95 (5th Cir.1994) (*Clark I*). "[T]he question is not whether the plaintiff residents' proposed district was oddly shaped, but whether the proposal demonstrated that a geographically compact district could be drawn." *Clark I,* 21 F.3d at 95. "Thus, although the edges of the plaintiff residents' proposed district look ragged in places, this does not automatically mean failure to meet the first *Gingles* precondition." *Houston,* 56 F.3d at 611.

■ Considering the size and concentration of the minority population in Lafayette County, this court finds that the Plaintiffs meet the compactness precondition. *See id.* ("The district court should have focused on the size and concentration of the minority population ...."). Blacks constitute approximately 25.1% of the County's total population. Other minorities constitute an additional 2.0%. Therefore, in Lafayette County minorities constitute over one-fourth of the total population. Further, blacks constitute 21.1% of the voting age population. Since the County contains five single-member supervisory districts, clearly the size of the minority population is large enough to constitute a majority in one of those districts.

As to concentration, the Defendants argue that the black population in Lafayette County is "dispersed throughout the county in discrete pockets ... separated by miles." Defendants' Proposed Findings of Fact and Conclusions of Law, p. 14 (quotations omitted). Therefore, the Defendants argue, the black population *is not sufficiently* concentrated for the creation of a majority-minority district. The court must disagree. The court has reviewed the Plaintiffs' two proposed supervisory plans and certainly agrees that both plans contain ragged edges in order to reach some of the "pockets" of the

black population. The third district in plan "B" even contains three thin appendages that reach awkwardly into minority communities located in and around the City of Oxford. However, the Fifth Circuit has also reviewed the plans and concluded that at least one of them "is not nearly as 'bizarre' as those rejected in *Shaw v. Reno*, criticized in *Growe*, or invalidated in *Vera v. Richards*. Indeed, the compactness of the district in the plaintiff residents' proposed plan resembles that of many districts considered constitutionally acceptable by other courts." *Houston*, 56 F.3d at 611 (citations omitted). In accordance with the Fifth Circuit's pronouncement on the matter, this court concludes that the concentration of the minority population in Lafayette County is sufficiently concentrated for the creation of a majority-minority district.

### Second and Third Preconditions— Black Political Cohesiveness and White Bloc Voting

 The phrases "black political cohesiveness" and "white bloc voting" both essentially identify racially polarized voting. *See Gingles*, 478 U.S. at 52 n. 18, 106 S.Ct. at 2767 n. 18 ("The terms 'racially polarized voting' and 'racial block voting' are used interchangeably throughout this opinion."). Racially polarized voting "exists where there is a consistent relationship between the race of the voter and the way in which the voter votes." *Id.* at 54 n. 21, 106 S.Ct. at 2768 n. 21. To show racially polarized voting, the Plaintiffs presented the expert testimony of Allan J. Lichtman, Ph.D., who offered his opinions as to the voting preferences of white and black voters in Lafayette County. His method in reaching his opinions was to compare the racial composition of each precinct in the County to the division of the votes cast in each precinct for black and white candidates. Dr. Lichtman applied two statistical methods in conducting this comparison: ecological regression analysis and extreme case

analysis. Ecological regression analysis is a method by which one can infer the voting behavior of whites and blacks. Ecological regression analysis "generates prediction equations that indicate how voting responds to variations in the proportions of whites and minorities in each precinct." Plaintiffs' Exhibit "P–1" at 4 (Final Report: Racially Polarized Voting and Political Consequences, Lafayette County, Mississippi, 1979–1991, by Allan J. Lichtman) (admitted into evidence May 24, 1993). Extreme case analysis examines the actual choices of voters only in the most heavily white and the most heavily black precincts.[2] Instead of inferring voting behavior, extreme case analysis "simply tallies the votes actually cast for black and white candidates in the heavily white precincts [and the heavily black precincts]." *Id.* at 5. Dr. Lichtman presented his opinions in two reports, one admitted into evidence during the bench trial held in May of 1993, the other admitted during the hearing in June of 1998.

For his 1993 report, Dr. Lichtman analyzed 19 "black versus white" elections from 1979 to 1991. The study focused on primary elections for the board of supervisors but also included general elections for the board of supervisors and elections for a variety of other public offices. In the report, Dr. Lichtman concluded that there is "a substantial and consistent pattern of racially polarized voting . . . ." Plaintiffs' Exhibit "P–1" at 7 (May 24, 1993). In particular, Dr. Lichtman found that

[i]n 14 of the 19 primary elections studied it was feasible to estimate both black and white voting through ecological regression analysis. White voters invariably prefer white rather than black candidates, clearly demonstrating a pattern of white bloc voting. Black voters, however, primarily prefer candidates of their own race, clearly showing that they constitute a cohesive voting block. In the remaining 5 primary elections, extreme case analysis of over-

---

**2.** Dr. Lichtman noted as follows how the extreme case technique is applicable in Lafayette County:
 The technique is applicable in Lafayette County only to extreme white precincts, in this case, precincts 90% white or more in their voting age population. The districting structure with-

in Lafayette County, in which blacks are broadly spread across districts, has produced a corresponding precinct structure with no extreme black precincts.
Plaintiffs' exhibit "P–1" at 5 (May 24, 1993).

whelmingly white precincts confirms the findings of the ecological regression analysis.

*Id.* For his 1998 report, Dr. Lichtman analyzed 16 "black versus white" elections in 1995 and 1996 for county supervisor and other political offices. Again, Dr. Lichtman found "a substantial and consistent pattern of racially polarized voting for elections in Lafayette County." Plaintiffs' Exhibit "P–8" at 2 (Updated Report on Racially Polarized Voting and Political Consequences: Lafayette County, Mississippi, 1995–1996, by Allan J. Lichtman) (admitted into evidence June 16, 1998). As to white bloc voting, Dr. Lichtman specifically found the following:

> [E]xtreme cases analyses include 6 elections for County Supervisor. In all 6 County Supervisor elections, results ... show that black candidates won less than a third of the vote cast in the heavily white precincts. On average for these 6 supervisorial elections, ... the vote cast for black candidates in the heavily white precincts was 25 percent.
>
> Ecological regression was performed in 8 of the 14 elections. The results of this analysis closely correspond to the findings of extreme case analysis. For all 8 elections, ... the percentage of white voters voting for the [black] candidates was estimated to be 28 percent or less. On average for these 8 elections, ... the vote cast for black candidates by white voters was 15 percent.

*Id.* at 3; *see also Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1397 (5th Cir.1996) (*Clark II*) ("[E]xogenous elections—those not involving the particular office at issue—are less probative than elections involving the specific office that is the subject of the litigation.") (citing *Clark I*, 21 F.3d at 97). As to black political cohesiveness, Dr. Lichtman specifically found that

> in 7 of 8 elections included in this study, ecological regression results ... show that a majority of black voters opted for black candidates. In 6 of 8 elections 70 percent or more of black voters voted for black candidates. On average for all 8 elections,

the mean black vote for black candidates was 73 percent. Results ... show that for the supervisorial elections for which ecological regression could be performed, the black vote for the black candidate was 70 percent and 74 percent respectively.

These ecological regression results are corroborated by the examination of the extreme case analysis for white precincts. Of course, results for extreme white precincts do not directly provide indications of black cohesion. Such cohesion, however, can emerge from differences between the vote for black candidates overall ... and the vote for these candidates in the heavily white precincts.

Plaintiffs' Exhibit "P–8" at 4 (June 16, 1998). To show how results in extremely white precincts indicate black political cohesion, Dr. Lichtman explained, "If the overall vote for black candidates in an election is substantially higher than the vote in the extreme white precincts, this indicates a much more heavily black than white vote for the black candidates." Plaintiffs' Exhibit "P–1" at 5 (May 24, 1993).

Responding to Dr. Lichtman, the Defendants presented the findings and opinions of another expert, Ronald E. Weber, Ph.D. Interestingly; Dr. Weber's findings support Dr. Lictman's conclusions that blacks in Lafayette County are politically cohesive. Dr. Weber analyzed 19 supervisory elections which were held from 1983 to 1995. Dr. Weber focused on elections in districts 3 and 4, and he considered general, Democratic primary and run-off elections. Based on his estimations [3] of the support of blacks for their candidates of choice, Dr. Weber concluded that blacks were cohesive in 16 of those 19 elections. Defendants' Exhibit "1," Table 9 (A Final Report on Vote Dilution Issues on Remand for the Case of Houston v. Lafayette County, Mississippi, by Ronald E. Weber) (admitted into evidence June 16, 1998). Specifically, Dr. Weber concluded that blacks were moderately cohesive in 8 of the 19 elections and strongly cohesive in another 8. *Id.* In only 3 elections did Dr. Weber conclude that blacks were not cohe-

---

**3.** In making his estimations, Dr. Weber employed the following techniques: standard weighted regression, extreme case, and ecological inference.

sive. *Id.* Dr. Weber defined cohesiveness as follows:

> When a group's percentage of support for a candidate of choice is at least 60 percent of the total vote for the two top candidates and at least 50 percent of the total vote among all candidates, I will classify the group as acting cohesively.... [L]evels of 80 percent or more of African–American voters supporting a preferred candidate indicat[e] strong levels of cohesion, and levels between 60 and 79 percent of African–American voters supporting a preferred candidate indicat[e] moderate levels of minority cohesion.

*Id.* at 21. Therefore, according to the Defendants' expert witness, in the vast majority of supervisory elections in districts 3 and 4 from 1983 to 1995, the support of blacks for their candidate of choice constituted at least 60% of their total vote for the top two candidates and at least 50% of their total vote for all candidates. Further, in half of those elections, the support of blacks for their candidate of choice exceeded 80%. Even Dr. Weber concluded that these results clearly show black political cohesiveness. *See id.* at 25 ("Overall, in the elections for District 3 and 4 positions on the County Board of Supervisors from 1983 through the present I find that African–American voters were usually moderately or strongly cohesive in support of candidates of choice.").

Dr. Weber also addressed whether the white majority in Lafayette County votes sufficiently as a bloc usually to defeat the minority's preferred candidate. Again looking at the 19 elections he listed in Table 9 of his report, Dr. Weber found that the candidate of choice of the black population won 15 of the 19 elections. Defendants' Exhibit "1" at 25 and Table 9. Notably, however, Dr. Lichtman criticized this finding. Dr. Lichtman argued that the 19 elections included 5

unopposed elections and a number of elections presenting only white candidates; therefore, many of the candidates "preferred" by blacks were white by default.[4] The finding is also misleading, Dr. Lichtman argued, because it includes primary and run-off elections, in which many white voters do not participate. Dr. Lichtman pointed out that only once has a black candidate ever won the general election for a seat on the Lafayette County Board of Supervisors. That individual was Robert Blackmon, an African–American whom the voters of the third supervisory district elected to the Board of Supervisors in 1995 with 51.8% of the total votes cast in that district.

Considering all the evidence in this action, the court is persuaded by Dr. Lichtman's reports, testimony and criticisms of Dr. Weber's opinions. Therefore, the court finds that the Plaintiffs have met the second and third *Gingles* preconditions. That one black candidate has found success in one supervisory general election does not defeat this conclusion. *See Clark II,* 88 F.3d at 1397 ("[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote.") (citations and quotations omitted).

### Whether the County Violated § 2

 Now the court will determine whether, under the totality of the circumstances, the Plaintiffs has proven the existence of vote dilution under the challenged plan. *Houston,* 56 F.3d at 609–10. In the totality-of-circumstances inquiry, "the existence of racially polarized voting and the extent to which minorities are elected to public office [are] the two most important factors." *Clark II,* 88 F.3d at 1397. Since the court has already addressed one of these factors above, the analysis will be brief.

---

**4.** Of course, Dr. Lichtman is not arguing here that black voters always prefer black candidates over white candidates. Indeed, Dr. Weber showed that, according to one statistical technique, black voters in district 4 of Lafayette County preferred a white candidate over a black candidate in the 1995 Democratic primary and run-off. According to his weighted regression analysis, Dr. Weber showed that 56.8% of black voters in the primary voted for the white candi-

date Jim Q. Tatum over the black candidate Ollie Redmon Jr., and that 57.4% of black voters in the run-off voted for Tatum over Redmon. On the other hand, according to another statistical method Dr. Weber employed—ecological inference—Dr. Weber showed that black voters preferred the black candidate: 51.5% of blacks voting in the primary voted for Redmon over Tatum, and 54.0% of blacks voting in the run-off voted for Redmon over Tatum.

The Defendants argue that blacks "are successful in all facets of the electoral process in Lafayette County ...." Defendants' Proposed Findings of Fact and Conclusions of Law, p. 37. This statement greatly exaggerates the success of blacks running for political office in the County, particularly the office at issue in this litigation. Since 1983, blacks have run for a seat on the Board of Supervisors approximately 12 times and lost every time but once. The court considers this evidence of vote dilution. While blacks have enjoyed somewhat better success running for other county offices such as constable and board of education member, those exogenous elections are not as probative as the supervisory elections at issue here.

Considering other factors in totality-of-circumstances inquiry, the court finds additional evidence of vote dilution. For example, the State's majority vote requirement "permits a white majority that scattered its votes among several white candidates in an election to consolidate its support behind the remaining white candidate in the run-off election, thereby defeating the minority-supported candidate." *Clark II*, 88 F.3d at 1398. On the other hand, there is also evidence supporting a finding against a § 2 violation. For example, the court finds that political campaigns in Lafayette County have not been characterized by overt or subtle racial appeals. The court also finds that the history of official discrimination in the State of Mississippi and Lafayette County does not currently appear to touch the right of blacks to register, vote or otherwise participate in the democratic process.[5] However, the court notes, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763. Therefore, the court refuses to tally the factors pointing to each side as if keeping score.

The court also refuses to afford much weight to a factor which the Defendants repeatedly assert, that black turnout in elections in Lafayette County is higher than white turnout. In particular, the Defendants

state "that the black electorate of Lafayette County registers in greater percentages than does the white electorate and that participation rates are higher." Defendants' Proposed Findings of Fact and Conclusions of Law, p. 34. Therefore, the Defendants argue, the black electorate overcomes its minority position in each district and enjoys success electing black-preferred candidates. The Plaintiffs argue that the Defendants' turnout figures are skewed because they include turnout figures for students of the University of Mississippi. The Plaintiffs argue that most students, most of whom are white, do not vote in Lafayette County elections. Therefore, white turnout appears lower than it actually is among white permanent residents of the County. Fortunately, the court need not resolve the issue of the effect of the student population on turnout figures. Even assuming that black turnout exceeds white turnout to the degree which the Defendants insist, blacks have not enjoyed the success at the polls which the Defendants assert. The court has already discussed the flaws of the Defendants' assertion that black-preferred candidates have won 15 of 19 elections analyzed by Dr. Weber. Also considering the difficulty blacks have demonstrated being elected to the Board of Supervisors, the court easily finds that the Defendants' turnout figures do not tip the scale in their favor in this totality-of-circumstances inquiry.

In conclusion, considering the totality of the circumstances, and guided on remand by the directions of the Fifth Circuit, the court is persuaded that the Plaintiffs have proven a § 2 violation in this case. Accordingly, the Defendants shall be allowed an opportunity to develop a remedial plan. *See Clark I*, 21 F.3d at 95 ("If a § 2 violation is found, the county will be given the first opportunity to develop a remedial plan."). Regarding the remedial plan, the court finds important the testimony of Dr. Lichtman concerning the creation of a "super majority district." Dr. Lichtman testified that any majority black district would remedy the § 2 violation in this case. Therefore, he stated, a super ma-

---

5. As to the racial-appeals and history-of-discrimination factors, the court primarily bases its findings on the relevant testimony of David Sansing,

Ph.D., the Defendants' political history expert who testified during the 1993 bench trial. *See* Transcript at 328–30.

jority district is not necessary. An example of "super majority district," Dr. Lichtman testified, is one which contains a black population which numbers over 60% of the total population. The court agrees with Dr. Lichtman that a super majority district is not necessary in Lafayette County. To the court, a super majority district touches on a worry the court raised in its prior opinion. The concern is that

> [w]hen blacks are funneled into a majority minority district, they effectively become segregated from white voters. Thus, they are deprived of any opportunities for formulating voting coalitions with moderate white voters who, in turn, have similarly been submerged into a racially homogenous white district on the assumption that white voters too are an indistinguishable mass of humanity.

*Houston v. Lafayette County, Miss.*, 841 F.Supp. 751, 766 (N.D.Miss.1993).

A separate order in accordance with this opinion shall issue this day.

### ORDER

Pursuant to a memorandum opinion issued this day, the court CONCLUDES that the current supervisory districting scheme in Lafayette County violates § 2 of the Voting Rights Act. THEREFORE, it is hereby ORDERED that the Defendants DEVELOP a districting plan to remedy the violation and SUBMIT the same to the court and the Plaintiffs within 90 days from the date of this order.